NO. 25-2759

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

NATIONAL LEGAL AND POLICY CENTER, et al.,
Plaintiffs-Appellants,

v.

BERKSHIRE HATHAWAY, INC., et al.,
Defendants-Appellees.

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BRIEF OF PLAINTIFFS-APPELLANTS NATIONAL LEGAL AND POLICY
CENTER, PETER T. FLAHERTY, AND JAMES R. TOVAR

Jeffrey E. McFadden
LAW OFFICES OF
JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
Phone: (443) 272-4737
jmcfadden@jmcfaddenlaw.com

*Counsel for Plaintiffs-Appellants*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This case concerns Defendants'-Appellees' unprecedented censoring of Plaintiff-Appellant National Legal and Policy Center's ("NLPC's") presentation of a shareholder proposal at Berkshire Hathaway's annual meeting on May 6, 2023. Berkshire's Chairman, Warren Buffet, acting through Berkshire agents, had NLPC's Chairman and presenter, Peter T. Flaherty, arrested, ejected, and prosecuted in the course of NLPC's presentation while accosting NLPC senior staffer James R. Tovar and preventing him from leaving the meeting.

NLPC, Mr. Flaherty, and Mr. Tovar filed suit against Mr. Buffett, Berkshire Hathaway, and the "John Doe" security guards in the U.S. District Court for the District of Nebraska, lodging causes of action in assault, battery, false imprisonment, malicious prosecution, intentional infliction of emotional distress, and promissory estoppel. Defendants-Appellees then moved to dismiss the complaint, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The District Court granted Defendants' motions in full.

Given the grave errors of law contained in the District Court's decision and the complex questions of tort law and quasi-contract law it considered, Plaintiffs/Appellants respectfully request the opportunity to present their points to this Court at oral argument and estimate the time needed to be 20 minutes per side.

# COPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1a and the Court's Order filed on September 9, 2025, Appellants National Legal and Policy Center ("NLPC"), Peter T. Flaherty, and James R. Tovar, hereby state that NLPC is a tax-exempt, nonprofit entity pursuant to 26 U.S.C. § 501(c)(3) and has no corporate shareholders, parents, or affiliates.

**TABLE OF CONTENTS**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ......... .ii

DISCLOSURE STATEMENT …….......................................................iii

TABLE OF CONTENTS .................................................................iv

TABLE OF AUTHORITIES .............................................................vi

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 1

STATEMENT OF THE CASE .......................................................... 4

      A.    INTRODUCTION................................................... 4

      B.    STATEMENT OF FACTS…………………………………... 7

      C.    PROCEDURAL HISTORY …….................................. 14

SUMMARY OF THE ARGUMENT ................................................... 17

STANDARD OF REVIEW ........................................................ 19

ARGUMENT ....................................................................... 21

    I.    The District Court Erred in Holding That Plaintiff/Appellant Flaherty Was a Trespasser …………………………………………….. 21

    II.    In the Absence of Any Privilege Grounded in Trespass, the Amended Complaint States Legally Cognizable Claims of Assault, Battery, False Imprisonment, and Malicious Prosecution as to Mr. Flaherty...30

    III.    The Video Defendants Submitted Establishes Mr. Tovar's Claims for Assault, Battery, and False Imprisonment ........................ 34

    IV.    The Amended Complaint Stated a Legally Cognizable Cause of Action for Promissory Estoppel ...................................... 36

V. The District Court Erred in Adopting the Report and
Recommendation of the Magistrate Judge ........................................ 38

CONCLUSION ....................................................................................... 40

CERTIFICATE OF COMPLIANCE .................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................20

*Bergman by Harre v. Aderson*,
  226 Neb. 333, 411 N.W.2d 333 (1987) ........................................................ 31, 35

*Blinn v. Beatrice Community Hosp. and Health Center, Inc.*
  270 Neb. 809, 708 N.W.2d 235 (2006) .................................................................36

*Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585 (8th Cir. 2009) ...............................20

*Chicago B. & Q.R. v. White,* 73 Neb. 870, 103 N.W. 661 (1905) ............................24

*Crouter v. Rogers*, 193 Neb. 497, 227 N.W.2d 845 (1975) ......................................35

*Guzman v. Barth*, 522 Neb. 763, 552 N.W.2d 299 (1996).......................................24

*Holmes v. Crossroads Joint Venture*,
  26 Neb. 739, 251 N.W.2d 144 (1977)........................................................... 33, 35

*Huskinson v. Vanderheiden*, 251 N.W.2d 144 (Neb. 1977) .....................................32

*Johnson v. City of Shelby*, 574 U.S. 10 (2014) ........................................................20

*McKinney v. Okoye*, 842 N.W.2d 581 (Neb. 2014).................................................33

*Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928 (8th Cir. 2012)....................25

*Morris v. Dall,* 320 Neb. 122, 26 N.W.3d 304 (2025) .............................................36

*Newman v. Christensen*, 31 N.W.2d 417 (Neb. 1948) .............................................31

*Noble Systems Corp. v. Alorica Cent., LLC*, 543 F.3d 978 (8th Cir. 2008)).............26

*O'Neil v. Simplicity, Inc.*, 574 F.3d 501 (8th Cir. 2009)..........................................19

*Young v. City of St. Charles, Mo.*, 244 F.3d 623 (8th Cir. 2001)..............................20

**Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1332 ......................................................................................1

Del. Gen. Corp. Law § 211 ....................................................................25

Del. Gen. Corp. Law § 212 ....................................................................25

Neb. Rev. Stat. § 29-401 ........................................................................21

Omaha Mun. Ordinance § 20-154 ...................................... 18, 22, 231, 242

Omaha Mun. Ordinance § 20-155 ...................................................... passim

**Rules**

Fed. R. App. P. 32....................................................................................42

Fed. R. App. P. 4......................................................................................1

Fed. R. Civ. P. 12.....................................................................................15

Securities and Exchange Commission Rule 14a-8 ................................27

**Regulations**

17 C.F.R. § 240.1-8(h)(1)........................................................................25

41 C.F.R. Part 102-3 (2023)....................................................................1

**Treatises**

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004) .........................................................................25

**Other Authorities**

Harvard Law School Forum on Corporate Governance, *Statement on Corporate Governance and Annual General Meetings in 2025*, (Jan. 15, 2025), available at https://corpgov.law.harvard.edu/2025/01/15/statement-on corporate-governance-and-annual-general-meetings-in-2025/ ...........................................................25

U.S. Securities and Exchange Commission, *The Shareholder Proposal Rule: A Cornerstone of Corporate Democracy*, (Mar. 8, 2022), available at https://sec.gov/newsroom/speeches-statement/jones-cii-2022-03-08 .................26

Omaha Police Department Trespassing Policy, Addendum at 45…………..passim

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(A)(1) because there was complete diversity between and among the parties and the amount in controversy exceeded $75,000.00, exclusive of interest and costs.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because it is from a final judgment of the District Court disposing of all parties' claims. The District Court entered judgment on August 8, 2025; Plaintiffs filed their Notice of Appeal on September 8, 2025. The appeal is thus timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in granting Defendants'-Appellees' Motion to Dismiss by holding that

a. Plaintiff-Appellant Flaherty failed to state a claim for assault because Defendants'-Appellees' actions were privileged in light of Mr. Flaherty's purported trespass,

> Apposite Authority: Omaha Mun. Ordinance § 20-154; Omaha Mun. Ordinance § 20-155; Omaha Police Department Trespassing Policy ("OPD Policy"); *Crouter v. Rogers*, 193 Neb. 497, 227 N.W.2d 845,

847 (1975).

b.       Plaintiff-Appellant Flaherty failed to state a claim for battery because Defendants'-Appellees' actions were privileged in light of Mr. Flaherty's purported trespass, and

Apposite Authority: Omaha Mun. Ordinance § 20-154; Omaha Mun. Ordinance § 20-155; OPD Policy; *Bergman by Harre v. Aderson*, 226 Neb. 333, 411 N.W.2d 333, 336 (1987).

c.       Plaintiff-Appellant Flaherty failed to state a claim for false imprisonment because Defendants'-Appellees' actions were privileged in light of Mr. Flaherty's purported trespass.

Apposite Authority: Omaha Mun. Ordinance § 20-154; Omaha Mun. Ordinance § 20-155; OPD Policy; *Holmes v. Crossroads Joint Venture*, 26 Neb. 739, 251 N.W.2d 144, 146 (1977)

2.     Whether the District Court erred in holding that Plaintiff-Appellant Mr. Flaherty failed to state a claim for malicious prosecution because

a.       Defendants'-Appellees' actions were privileged in light of Mr. Flaherty's alleged trespass and

Apposite Authority: Omaha Mun. Ordinance § 20-154; Omaha Mun. Ordinance § 20-155; OPD Policy

b.       Defendants-Appellees were not the cause of Mr. Flaherty's

prosecution.

Apposite Authority: *Holmes v. Crossroads Joint Venture*, 629 N.W.2d 511, 526-27 (Neb. 2001).

3.     Whether the District Court erred in holding that Plaintiff-Appellant Tovar failed to state a claim for assault.

Apposite Authority: *Crouter v. Rogers*, 193 Neb. 497, 227 N.W.2d 845, 847 (1975).

4.     Whether the District Court erred in holding that Plaintiff-Appellant Tovar failed to state a claim for battery.

Apposite Authority: *Bergman by Harre v. Aderson*, 226 Neb. 333, 411 N.W.2d 333, 336 (1987).

5.     Whether the District Court erred in holding that Plaintiff-Appellant Tovar failed to state a claim for false imprisonment.

Apposite Authority: *Holmes v. Crossroads Joint Venture*, 26 Neb. 739, 251 N.W.2d 144, 146 (1977).

6.     Whether the District Court erred in holding that Plaintiff-Appellants NLPC and Mr. Flaherty failed to state a claim for promissory estoppel.

Apposite Authority: *Morris v. Dall,* 320 Neb. 122, 26 N.W.3d 304, 315 (2025); *Blinn v. Beatrice Community Hosp. and Health Center, Inc.* 270 Neb. 809, 708 N.W.2d 235 (2006).

7.     Whether the District Court erred in failing to consider Plaintiffs-Appellants Flaherty's argument that the Plaintiffs-Appellants were special invitees and thus Mr. Flaherty was not a trespasser.

Apposite Authority: Omaha Mun. Ordinance § 20-154; Omaha Mun. Ordinance § 20-155; OPD Policy

8.     Whether the District Court erred in adopting the report and recommendations of the Magistrate Judge.

Apposite Authority: None

## STATEMENT OF THE CASE

### A.     INTRODUCTION

On May 6, 2023, Defendant-Appellee Warren Buffett made public corporate governance history at the annual meeting of his company, Defendant-Appellee Berkshire Hathaway Inc. He did so by sending a clear and unambiguous warning to all shareholders who, pursuant to state and federal law, have been approved to present a shareholder proposal at those meetings: If you show up and speak at one of those meetings, and Mr. Buffett does not like what you have to say, Mr. Buffett will cut you off in mid-sentence, turn off your microphone, have you arrested, ejected, and prosecuted, and your rights as a proponent of a  Berkshire Hathaway shareholder proposal, including your right to vote on it, will be abrogated.

The victims of Mr. Buffett's and Berkshire Hathaway's brand of private, pernicious censorship and viewpoint discrimination that day were Plaintiffs/Appellants Peter T. Flaherty; the National Legal and Policy Center ("NLPC"), a nonprofit for whom Mr. Flaherty serves as its Chairman; and a senior NLPC staffer, James Tovar. NLPC is the sponsor of the Corporate Integrity Project, which exposes corruption in public companies and addresses corporate governance and policy issues through shareholder activism. App. 119 R. Doc 56, at 3.

In furtherance of that mission, NLPC submitted a shareholder proposal which was duly included in Berkshire Hathaway's proxy statement dated March 17, 2023. App. 119 R. Doc. 56, at 3; App. 75-76 R. Doc. 22-2 at 15-16. In connection with the proxy statement, NLPC submitted a Notice of Exempt Solicitation (the "Notice") in support of the proposal. Among other things, the Notice addressed Mr. Buffett's "support for controversial and divisive political issues" through his billion-dollar donations to the Bill and Melinda Gates Foundation and the Susan Thompson Buffett Foundation. The Notice was accessible through links to both the Securities and Exchange Commission's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") website and NLPC's website. App. 120 R. Doc. 56 at 4.

In advance of the shareholders meeting on May 6, Berkshire Hathaway sent Messrs. Flaherty and Tovar credentials for admission to the meeting and for Mr. Flaherty's presentation of NLPC's shareholder proposal. App. 121 R. Doc. 56 at 5.

In reliance on that invitation, in reliance on NLPC's previous publication of both the Notice and the entirety of Mr. Flaherty's planned remarks on NLPC's website, and in reliance on Berkshire Hathaway's published "Microphone Manners" that any topic other than politics or Berkshire's investments was "fair game," Messrs. Flaherty and Tovar traveled from Virginia to Omaha, Nebraska to attend the meeting and make the presentation. App. 120-122 R. Doc. 56 at 4-6.

When it came his turn to present the NLPC proposal, Mr. Flaherty got approximately one minute into his remarks when a Berkshire Hathaway officer standing by his microphone interrupted him and told him to stay "on topic." App. 122 R. Doc. 56 at 6. Mr. Flaherty stated into the microphone, "You are not going to censor what I say, Ma'am. I'm very sorry. And I appeal to the Chair (Mr. Buffet) that I be allowed to continue. Sir?" App. 122 R. Doc. 56 at 6; App. 87 R. Doc. 22-3 at 278. Mr. Buffett stated, "You may continue but under the three-minute limitation." App. 122 R. Doc. 56 at 6; App. 87 R. Doc. 22-3 at 278. In reliance on that assurance, Mr. Flaherty said "Of course" and continued his presentation. App. 122 R. Doc. 56 at 6. Half a minute later, however, when in the course of criticizing Mr. Buffett's contributions to the Bill and Melinda Gates

foundation, he made reference to the well-publicized relationship between Mr. Gates and Jeffrey Epstein, Mr. Buffett talked over Mr. Flaherty and ordered that Mr. Flaherty be removed. App. 122 R. Doc. 56 at 6; App. 88 R. Doc. 22-3 at 279. Unbeknownst to Mr. Flaherty, who did not hear Mr. Buffet's directive, Mr. Flaherty's microphone was turned off while Mr. Flaherty continued to speak. App. 122 R. Doc. 56 at 6. Two plainclothes security guards, later identified as Berkshire Hathaway agents Chris Thompson and Dan Clark, then came to the microphone, confronted Mr. Flaherty, called over a police officer, and while the police officer grabbed Mr. Flaherty's left arm, one of the security guards grabbed Mr. Flaherty's right arm, and the two marched Mr. Flaherty out of the meeting. App. 122-123 R. Doc. 56 at 6-7; App. 34 R. Doc. 21 at 6, n.5 (link to video). When Mr. Tovar tried to leave the meeting with Mr. Flaherty, the other security guard ran up behind him, grabbed him by the arm to stop him, stood in front of him, raised his hands to signal "You're not going anywhere," and would not let him leave. Video of Proceedings. Meanwhile, Mr. Flaherty was held in a room outside of the hall where the shareholders meeting was taking place for a period of time against his will and then taken to a police station where he was booked, photographed, and fingerprinted. App. 123 R. Doc. 56 at 7.

## B.   STATEMENT OF FACTS

NLPC is a 501(c)(3) nonprofit organization under the Internal Revenue

Code, granted tax-exempt status in 1993. NLPC is the sponsor of the Corporate Integrity Project, through which it exposes corruption in public companies, and addresses corporate governance and policy issues through shareholder activism. App. 119 R. Doc. 56 at 3; *see also* https://nlpc.org/corporate-integrity-project/.

NLPC has engaged in shareholder activism since 2004. In 2023, NLPC filed 26 shareholder proposals on a variety of topics. NLPC-filed proposals for an independent chair were also considered in 2024 at Bank of America, Coca-Cola, Goldman Sachs, Home Depot, Mondelez, PepsiCo, Salesforce, and Visa. App. 119 R. Doc. 56 at 3.

Peter Flaherty is Chairman of NLPC and has personally delivered prepared remarks supporting NLPC's proposals at various shareholder meetings. App. 119 R. Doc. 56 at 3.

On October 18, 2022, Paul Chesser, Director of NLPC's Corporate Integrity Project, submitted a shareholder proposal to Berkshire Hathaway titled "Request for Board of Directors to Adopt Policy for Independent Chair." NLPC's cover letter included the SEC-required information about NLPC's availability to discuss the proposal with the company should it wish to do so. At no time did the company contact NLPC about having such informal engagement. App. 119 R. Doc. 56 at 3.

NLPC was the proponent of a similar proposal for an independent chair in 2022. At Berkshire Hathaway's 2022 shareholders' meeting, Mr. Flaherty spoke

then in support of the resolution for more than five minutes without incident. It received support from diverse shareholders including a public endorsement by the California Public Employees' Retirement System (CalPERS). The proposal received the vote of 10.67% of the outstanding shares, thereby qualifying it for reconsideration in 2023. App. 119 R. Doc. 56 at 3.

The renewed proposal and supporting statement were published in Berkshire Hathaway's proxy dated March 17, 2023, as Proposal No. 8.5. On April 21, 2023, NLPC submitted a Notice of Exempt Solicitation in support of the proposal. Links were published on the SEC's EDGAR website and on Berkshire Hathaway's website. App. 120 R. Doc. 56 at 4.

The Notice addressed a number of topics, including the benefits to public companies of having different individuals occupying the positions of Chief Executive Officer and Chairman, citing several corporate governance experts. The Notice also analyzed Berkshire's "underwhelming" succession plan and criticized Mr. Buffett's failure to hold portfolio company executives accountable for public policy stances and interventions. App. 120 R. Doc. 56 at 4.

Finally, the Notice addressed Mr. Buffett's "support for controversial and divisive political issues" through his billion-dollar donations to the Bill and Melinda Gates Foundation and the Susan Thompson Buffett Foundation. App. 120 R. Doc. 56 at 4.

From the Notice:

> Another argument for an independent chair policy at Berkshire Hathaway is the fact that the company's identity *is* Mr. Buffett, whether he likes it or not (we think he does). The consequence of this entanglement is the perception that his engagement on controversial issues is endorsed by the Company - a view that Mr. Buffett says he does not want.

App. 120 R. Doc. 56 at 4.

On April 24, 2023, NLPC reported on its website that it had filed the Proposal and the Notice of Exempt Solicitation and repeated the themes in those two documents. App. 120 R. Doc. 56 at 4.

On May 1, 2023, Mr. Chesser received an email from Marc Hamburg, who is Berkshire Hathaway's Secretary, Senior Vice President and Chief Financial Officer, with instructions for proposal proponents for the day of the meeting, including where to report to deliver proposal presentations. The email stated, "Once you arrive at microphone zone 1, you should ask for either Dan Jaksich or Cathy Woollums." Ms. Woollums, who is senior vice president, chief sustainability officer for Berkshire Hathaway Energy, and Mr. Flaherty had met in 2022 as she had served the year before in the same role as a liaison for proposal proponents. Mr. Hamburg's email also stated, "You will have three minutes to present the proposal. However, we will be somewhat flexible as to time should you run over a minute or so." App. 120-121 R. Doc. 56 at 4-5.

On May 2, 2023, NLPC received two credentials for admittance to the

meeting via FedEx from Berkshire for Mr. Flaherty and Mr. Tovar, an NLPC senior staff member who planned to accompany Mr. Flaherty. On May 5, 2023, the day before Berkshire's shareholders' meeting, NLPC published on its website an advance copy of Mr. Flaherty's planned remarks for the next day, which, when read, were originally timed at four minutes and ten seconds. App. 121 R. Doc. 56 at 5.

The Berkshire shareholders' meeting took place on May, 6, 2023, at the CHI Health Center, 455 North 10th Street, Omaha, Nebraska, at approximately 4:30 p.m. CT. The actual business meeting was preceded by other events, including two lengthy question-and-answer sessions with Warren Buffett and Vice-Chairman Charlie Munger beginning at 10 a.m. with questions being asked by shareholders from the floor. App. 121 R. Doc. 56 at 5.

Mr. Flaherty arrived at microphone Zone 1 shortly before 4:30 p.m. on the concourse level as instructed and was greeted by Ms. Woollums. He was accompanied by Mr. Tovar. Ms. Woollums told Mr. Flaherty before he spoke that the three-minute limitation on his statement would be strictly enforced (contrary to the earlier email that the time limit as somewhat flexible) and that he should stay "on topic." App. 121 R. Doc. 56 at 5.

Proponents of four proposals spoke before Mr. Flaherty, including Michael Frerichs, Treasurer of Illinois. All four presentations went over the three-minute

limitation. There were no reminders or interruptions from the Chair (Mr. Buffett) or any other person. App. 121 R. Doc. 56 at 5.

Mr. Flaherty began to deliver his prepared remarks. Video of the event shows that at 1:08 minutes into his remarks, Mr. Flaherty was approached and interrupted at the microphone by Ms. Woollums. Not audible through the sound system, Ms. Woollums told Mr. Flaherty that he should stay "on topic." Mr. Flaherty stated into the microphone, "You are not going to censor what I say, ma'am. I'm very sorry. And I appeal to the Chair (occupied by Mr. Buffett) that I be allowed to continue. Sir?" App. 122 R. Doc. 56 at 6.

Mr. Buffett stated, "You may continue but under the three-minute limitation." Mr. Flaherty replied, "Of course," and resumed speaking at the 1:28 mark. At the 1:54 mark, Mr. Buffett attempted to talk over Mr. Flaherty and appeared to give direction to other persons in the hall. This portion of Mr. Flaherty's remarks concerned Bill Gates's relationship with Jeffrey Epstein, a topic that had been recently reported in depth in the *Wall Street Journal*. At the 2:04 mark, Mr. Flaherty's mic went dead, although Mr. Flaherty did not know it at the time. App. 122 R. Doc. 56 at 6.

Mr. Buffett and/or one of his agents acting on his or Berkshire's behalf intentionally ordered that Mr. Flaherty's mic be cut. The mic was not silenced due to some unforeseen mechanical failure. Importantly, neither NLPC nor Mr.

Flaherty were ever given notice that the topic of their proposal was somehow inappropriate or that Mr. Flaherty should self-censor the substance of his remarks. Indeed, with respect to the Q&A session open to any attendee, Berkshire's Shareholders Guide on "Microphone Manners" (p. 7) made clear that other than questions regarding Berkshire's investments or politics, "[a]ny other subjects are fair game." App. 122 R. Doc. 56 at 6.

Immediately, two men, who never identified themselves, but were plain clothes security guards Defendants Chris Thompson and Dan Clark hired by Berkshire, stood in front of Mr. Flaherty. He was told to leave or he would be arrested. Mr. Flaherty replied that he would leave when he finished his statement and told the one guard, "Mr. Buffett is in the chair and he will rule, not you." He also stated that if he was not allowed to finish that he would file a Complaint with the SEC. At this point, Mr. Flaherty was not fully aware that his mic had been cut, was still within the three-minute limitation, and had already received a favorable ruling from the Chair to continue his presentation. App. 122-123 R. Doc. 56 at 6-7.

The transcript reflects of the meeting reflects that Mr. Buffett said, "You crossed a boundary" which Mr. Flaherty did not hear, and ordered that Mr. Flaherty be ejected from the hall. App. 88 R. Doc 22-3 at 279.

Chris Thompson and/or Dan Clark summoned a uniformed Omaha policeman who was nearby and requested that he arrest Mr. Flaherty. He grabbed

Mr. Flaherty by the arm, advised him that he was under arrest, and led him from the arena. Mr. Tovar attempted to follow Mr. Flaherty as he was removed from the arena but was physically prevented from doing so by one of the two unidentified security guards. App. 123 R. Doc. 56 at 7; App. 34 R. Doc. 21 at 6, n.5 (link to video). One of the security guards physically touched Mr. Tovar to prevent him from leaving with Mr. Flaherty; App. 127 R. Doc. 56 at 11; and confined him to the CHI Health Center without his consent. App. 34 R. Doc. 21 at 6, n.5 (link to video).

Mr. Flaherty was taken to an office within the CHI Health Center. He was issued a "Report on the Issuance of a Ban and Bar Letter" by a man who never identified himself. Less than an hour later, Mr. Flaherty was transported by Omaha Police to the Douglas County Corrections Center where he was searched, handcuffed, fingerprinted, photographed, and charged with a Request to Leave, a violation akin to criminal trespass. In total, he was in custody for approximately three hours and was subsequently released after posting bail later that evening around 8:30 p.m. App. 123 R. Doc. 56 at 7. A few days later, the charges were dropped. App. 147 R. Doc 26-1 at 1.

## C.    PROCEDURAL HISTORY

Plaintiffs-Appellants filed their original Complaint on in the U.S. District Court for the District of Nebraska on May 3, 2024 App. 10-23 R. Doc. 1 at 1-14.

14

The Complaint named Warren Buffett, Berkshire Hathaway, Inc., and two John Does as defendants. The John Does were the plainclothes security guards who confronted Mr. Flaherty as he was speaking and summoned a uniformed police officer to arrest him. The Complaint lodged nine causes of action. The first five counts were brought by Mr. Flaherty: Assault (Count I), Battery (Count II), Intentional Infliction of Emotional Distress (Count III), False Imprisonment (Count IV), and Malicious Prosecution (Count V). The next three counts were brought by Mr. Tovar: Assault (Count VI), Battery (Count VII), and False Imprisonment (Count VIII). The final count was brought by NLPC and Mr. Flaherty: Promissory Estoppel (Count IX).

Defendants-Appellees moved to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 28, 2024. App. 24-52 R. Doc. 21 at 1-24. In support of their opposition to the motion to dismiss filed on August 19, 2024, R. Doc. 25 at 1-34, Plaintiffs-Appellants submitted a declaration by Mr. Flaherty, R. Doc. 26-3 at 1-8. Defendants moved to strike that declaration on September 9, 2024. On October 29, 2024, after full briefing on both motions, the District Court granted Defendants'-Appellees' motion to dismiss and motion to strike "to the extent that the Berkshire Defendants request that the Court disregard the Declaration" Add. 1-25 App. 92-116 R. Doc. 36 at 1-25.

On November 22, 2024, Plaintiffs-Appellants filed an amended complaint, the purpose of which was to substitute the John Doe defendants with Chris Thompson and Dan Clark. R. Doc. 42 at 1-14. The District Court struck the amended complaint on November 26, 2024, because Plaintiffs-Appellants had not sought leave to file it. R. Doc. 44 at 1. That same day, Plaintiffs-Appellants filed a notice of appeal from the District Court's granting of the motion to dismiss and the motion to strike R. Doc. 46 at 1. On December 10, 2024, this Court dismissed the appeal for lack of jurisdiction. R. Doc-50 at 1.

On January 7, 2025, the District Court issued an order to show cause as to why Plaintiffs'-Appellants' case should be dismissed for want of prosecution. R. Doc. 52 at 1. One week later, on January 14, 2025, Plaintiffs-Appellants filed a motion for leave to file the amended complaint they had originally filed on November 22, 2024 substituting the John Doe defendants with Chris Thompson and Dan Clark. R. Doc. 53 at 1. After full briefing, the District Court granted the motion R. Doc-55 at 1, and Plaintiffs-Appellants filed their amended complaint on February 14, 2025. App. 117-130 R. Doc. 56 at 1-14.

Four days later, on February 18, 2025, the Magistrate Judge assigned to the case issued Findings and Recommendation regarding the Amended Complaint, Add. 26-27, R. Doc-57 at 1-2, recommending that the claims be dismissed in their entirety for the reasons set forth in the District Court's Memorandum Opinion

16

dated October 29, 2024. Add. 1-25 App. 92-116 R. Doc. 36 at 1-25. On March 11, 2025, the District Court adopted the Findings and Recommendation of the Magistrate Judge in their entirety and dismissed all of Plaintiffs'-Appellants' claims against Defendants-Appellees Warren Buffett and Berkshire Hathaway for the reasons set forth in its Memorandum Opinion of October 29, 2024. Add. 28-30 R. Doc. 63 at 1-3.

Defendant Dan Clark filed a motion to dismiss for failure to state a claim on April 16, 2025. R. Doc. 69 at 1. The motion was unopposed. On August 8, 2025, the District Court issued a Memorandum and Order granting Clark's motion to dismiss, dismissing the claims against Chris Thompson without prejudice, and dismissing the case in its entirety. Add. 31-44 R. Doc. 71 at 1-14. The Court issued its Judgment to that effect the same day. R. Doc. 72 at 1.

Plaintiffs-Appellants timely filed their notice of appeal on September 8, 2025. App. 145-146 R. Doc. 73 at 1-2.

## SUMMARY OF THE ARGUMENT

As the District Court and Defendants/Appellees would have it, this is a trespassing case,[1] and because it is, Defendants were privileged to cause the multiple intentional torts described above against Plaintiff-Appellant Flaherty

---

[1] The first substantive sentence of the Brief in Support of Defendants' Motion to Dismiss states, "Plaintiff Peter Flaherty is a trespasser." App. 29 R. Doc. 21 at 1.

Mr. Flaherty, acting on behalf of NLPC, was no trespasser, and the notion that Mr. Flaherty admitted to the contrary in Plaintiffs'-Appellants' Amended Complaint is specious. Plaintiffs-Appellants were special invitees who had inalienable rights under state and federal law to be there and to whom the Defendants had granted permission to attend Berkshire Hathaway's annual shareholder meeting and present a proposal duly reflected in the Company's proxy statement. Pursuant to Omaha Municipal Ordinance Section 20-154, invitees and those with a legal privilege to be on the property are *not trespassers*, and because Plaintiffs-Appellants were *not trespassers*, the police officer summoned to arrest Mr. Flaherty had no legal basis for doing so pursuant to the "refusal to leave" provisions of Omaha Municipal Ordinance Section 20-155 and the Omaha Police Department Trespassing Policy. Moreover, there is no allegation in the Amended Complaint and no extrinsic evidence of record that Mr. Flaherty refused to leave in the presence of the officer, the only basis by which the officer could have made, and had to have made, the independent decision to arrest Mr. Flaherty.

In the absence of any such trespass, and further given Plaintiffs'-Appellants' rights under state and federal law to be there, Defendants had no legitimate justification for the intentional torts they inflicted on Mr. Flaherty.

As for Mr. Tovar, the Court found the allegations in the complaint wanting as to Mr. Tovar's assault, battery, and false imprisonment claims, despite that a

video provided to the District Court by Defendants in their Motion to Dismiss clearly shows Mr. Tovar being assaulted, battered, and falsely imprisoned.

The District Court erred in dismissing NLPC's and Mr. Flaherty's promissory estoppel claim because it misconstrued the nature of the promise on which both relied to their detriment. The District Court found that, because SEC regulations require a person presenting a shareholder proposal to appear personally at the annual meeting of shareholders, such an obligation is not a promise. But the promise on which NLPC and Mr. Flaherty relied was that they would be permitted to present the *full content* of their proposal without interruption, censorship, or the specter of ejection, arrest, and prosecution. Indeed, that promise was reiterated by Mr. Buffett when he told him after being interrupted by Ms. Woollums that he could continue as long as his remarks was limited to three minutes.

Finally, the District Court's adoption of a Magistrate Judge's findings and recommendation that the District Court should dismiss claims it had already dismissed was a pointless exercise and plain error.

**STANDARD OF REVIEW**

This Court reviews *de novo* the District Court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009). In reviewing a Rule 12(b)(6) motion, this Court must accept as true all the factual allegations contained in the complaint, and all

reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir. 2001).

Plaintiff need not make "detailed factual allegations," but, "[t]o survive a motion to dismiss, his complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when [a] Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). The complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible. *See Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (citation omitted). And federal pleading rules "do not countenance dismissal of a complaint for an imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 10, (2014).

**ARGUMENT**

**I.    THE DISTRICT COURT ERRED IN HOLDING THAT PLAINTIFF/APPELLANT FLAHERTY WAS A TRESPASSER.**

The District Court adopted Defendants'-Appellees' argument that the "refusal to leave" Omaha Municipal Code Section 20-155, stands for the proposition that one who is physically on the property of another and refuses to leave after being asked to do so is, by definition, a "trespasser." Add. 19 App. 110, R. Doc. 36 at 19 ("Because Flaherty had violated a legal ordinance of a Nebraska city, the officer could lawfully arrest him under Neb. Rev. Stat. § 29-401);" Add. 20 App. 111 R. Doc. 36 at 20 ("In light of Flaherty's self-pleaded trespass and violation of § 20-155, the Court finds that Plaintiffs have not alleged sufficient facts showing the Berkshire Defendants caused the commencement or prosecution of a proceeding against Flaherty.") But neither the ordinance itself nor the Omaha Police Department Trespass Policy (the "OPD Policy") concerning it supports that construction. To the contrary, the ordinance, when read in conjunction with the actual definition of "trespass" in the ordinance immediately preceding, and the Policy itself, both provide that a person who is *otherwise a trespasser*, and who refuses to leave after being asked to do so, is subject to arrest and a fine. The OPD Policy provides, in pertinent part:

**Laws Regarding Trespassing**

A.   Pursuant to Omaha Municipal Code § 20-154, it is unlawful for any person to purposely or knowingly enter or be upon the property of another without being invited, licensed, or privileged to do so.

    1.   A person who has been banned from or asked to leave a location may be arrested for trespassing if they return without permission and/or prior to the expiration of the banishment.

B.   Pursuant to Omaha Municipal Code § 20-155, it is unlawful for any person to fail or refuse to leave the property of another after being notified to leave by the owner, occupant, person in control, and/or by their agent.

Add. 45 App. 37, R. Doc. 21 at 9, n.9 (link to Policy) (emphasis added). The

Policy further provides, in pertinent part,

**VI.   Request to Leave**

    A.   The owner/agent or person in control of a residence/private property and/or commercial establishment may order *a trespasser* to leave the property (Omaha Mun. Code § 20-155).

        **NOTE:** This ordinance does not apply where both parties have equal rights to occupy the property (e.g., wife and husband in a private residence).

    B.   If a *trespassing person* has been ordered to leave the property and has failed to do so the property owner/agent may request police to have the trespasser removed.

    C.   Officers who respond to such calls will adhere to the following procedures:

        1.   Obtain the identification of the person who has refused to leave.

        2.   *The officer will witness the person in control of the property once more order the trespasser to leave.*

3. If *the trespassing person* fails to leave after being ordered to do so *in the presence of the officer*, *the trespasser* shall be arrested and charged with a violation of City Ordinance § 20-155 (Request to Leave).

4. Complete an Incident Report.

a. The officer shall include detailed information about the person giving the notification or ordering *the trespasser* to leave, including their position with the company or their authority as the person in control of the property.

Add. 49 App. 37, R. Doc. 21 at 9, n.9 (link to Policy) (emphasis added).

As all of this discussion makes clear, an arrest pursuant to Section 20-155 is only lawful if the person who is asked to leave *is a "trespassing person"* as that term is defined in Section 20-154. That ordinance provides as follows:

Sec. 20-154. - Trespass.

It shall be unlawful for any person purposely or knowingly to enter or be upon the property of another person *without being invited, licensed or privileged to do so*.

(Code 1980, § 20-154) (Emphasis added.)

Here, Defendants did not demand that Mr. Flaherty leave because he was a "trespassing person" under Section 20-154; they asked him to leave because they did not like what he was saying. Thus, the arrest pursuant to Section 20-155 was, for that reason alone, unlawful. Simply stated, the District Court erred in conflating the definition of "trespasser" with the separate right of one who owns or controls private property to eject that trespasser once the trespasser refuses to leave. Thus, while the District Court acknowledges in passing that Plaintiffs-Appellants argued

23

that Mr. Flaherty was a special invitee and not a trespasser, the District Court ignored the argument and its implications under the Omaha Municipal Code that actually defines "trespass."[2]

Under no construction of the allegations in the Amended Complaint can it possibly be concluded that Mr. Flaherty admitted he was a "trespasser" in that he "purposely or knowingly . . . enter[ed] or [was] upon the property of another person without being invited, licensed or privileged to do so." To the contrary, the allegations in the Amended Complaint plainly aver, and the District Court acknowledged, that Mr. Flaherty was both invited to the annual meeting and was privileged to be there.

To be sure, it is not accurate to state or suggest that Plaintiffs-Appellants were present at the annual meeting merely because Defendant-Appellee "invited"

---

[2] The cases cited by the District Court in support of its construction of Section 20-155, two of which are more than 100 years old, are inapposite and distinguishable. The person asked to leave the property in *Maynard v. State*, 81 Neb 301, 116 N.W.53 (1908) was not an invitee, and his right to enter the property of another was limited to retrieving what he claimed was his property. *Id.* at 58. The trespassers in *Chicago B. & Q.R. v. White,* 73 Neb. 870, 103 N.W. 661 (1905) and *Guzman v. Barth*, 522 Neb. 763, 552 N.W.2d 299 (1996) had no right whatsoever to be on the properties of another and were thus exactly the kind of trespasser identified by Omaha Mun. Code § 20-154. By contrast, Plaintiffs-Appellants were special invitees who had both the right to be present at the meeting and the right to present their shareholders' proposal pursuant to SEC rules and regulations and the General Corporation Law of Delaware. *See, infra,* for further explication of those rights.

them to attend and to present their shareholder proposal and were thus present only

by virtue Defendants'-Appellees' consent. They were, in fact, privileged to be

there, for two reasons. First, because SEC regulations *required* them to be there,

pursuant to 17 C.F.R. § 240.1-8(h)(1).[3] Second, because they had the *right* to be

there pursuant to the General Corporation Law of Delaware, the state of Berkshire

Hathaway's incorporation.[4] *See* Del. Gen. Corp. Law, §§ 211, 212. That

requirement and those rights are matters of state and federal law and are not

subject to the whims of a Delaware corporation's chairman or chief executive

officer. It is in this regard that Plaintiffs-Appellants were not simply business

invitees, they were special invitees who had a privilege to be present at the meeting

irrespective of the consent of Defendants-Appellees. Not only did the actions of

Defendants-Appellees wrongfully interfere with NLPC's right to present a

---

[3] The District Court cited this regulation in dismissing NLPC's and Mr. Flaherty's promissory estoppel claim. We explain in Part IV, *infra*, why the District Court erred in doing so.

[4] This Court may take judicial notice of the fact that Berkshire Hathaway, Inc. is incorporated in Delaware. *See Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004) ("While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned' without converting the motion into one for summary judgment.")

shareholder proposal, those actions wrongfully interfered with NLPC's right to vote on its own proposal and from listening and to and voting on the subsequent proposals as it and its agents were entitled to do.[5]

In the absence of any privilege grounded in trespass, Defendants/Appellees would have the burden of demonstrating that their actions constituting the intentional torts complained of were justified. And as the District Court recognized, "Ordinarily, the existence of a justification is a question of fact that the defendants must prove." Add. 12 App. 103 R. Doc. 36 at 12 (quoting *Noble Systems Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008)).

No such justification is plausible based on the pleadings and other materials of record, nor could it be. Indeed, Defendants'-Appellees' burden of justification is heightened by basic principles of corporate governance and the rights of shareholders of public companies. As pointedly stated in the Harvard Law School Forum on Corporate Governance*, Statement on Corporate Governance and Annual General Meetings in 2025*, (Jan. 15, 2025), available at https://corpgov.law.harvard.edu/2025/01/15/statement-on corporate-governance- and -annual-general-meetings-in-2025/,

---

[5] The transcript submitted in support of Defendants'-Appellees' Motion to Dismiss leaves no doubt that Mr. Flaherty had been removed before the vote on NLPC's proposal was taken. App. 88 R. Doc. 22-3 at 279.

A central tenet of U.S. capital markets is that boards of directors of public corporations are accountable to their shareholders. The annual general meeting of shareholders (AGM) is, therefore, a critical once-a-year forum where shareholders can exercise their rights by engaging directly with the board and management, voting on directors, and deliberating on fellow investors' proposals on significant issues facing the company. A well-run and open AGM that encourages full participation is essential to building trust and mutual understanding between companies and their stakeholders.

.   .   .   .

The right to file and vote on shareholder proposals on governance, and on environmental and social risks is a *fundamental right of investors* as key stakeholders in companies and supports a private ordering process that benefits both companies and their investors. Unfortunately, the process for filing, presenting, and voting on these proposals at AGMs is becoming ever more restrictive.

While board elections are one form of accountability, the ability to frame critical issues facing a company through proposals is an essential, efficient, and focused complement to the right of shareholders to vote for board members. Shareholder proposals allow investors of all sizes to present issues for consideration by fellow investors. Voting outcomes allow investors to express a collective voice on the materiality of many risk management issues that can strengthen critical corporate governance infrastructures.

Importantly, shareholder proposals are an important stewardship tool for investors to manage their portfolio risks by improving corporate governance and disclosures and encouraging responsible corporate action at investee companies. As such, we support the Securities and Exchange Commission's (SEC) Rule 14a-8 and *express grave concern regarding efforts to circumvent or dilute it*, including the lawsuit filed by Exxon against the proponents of a climate risk shareholder proposal in *Exxon v. Arjuna*. Such litigation is

27

counterproductive and could have a chilling effect on the ability of shareholders to exercise their voice in corporate annual meetings. We call on companies to respect and support shareholders' right to file proposals and to implement the needed processes to ensure they receive the proper attention of the board and shareholders.[6]

It cannot be seriously disputed that the Defendants'-Appellees' treatment of Plaintiffs-Appellants in this case had an equally chilling effect on the ability of shareholders to exercise their voice at corporate annual meetings.[7]

Even if Section 20-155 somehow contained its own definition of "trespass," (and it does not), no construction of the allegations in the Amended Complaint establish that the arresting police officer conformed with the requirements of the Omaha Police Department's Trespassing Policy as to what constitutes a lawful arrest under the ordinance; specifically, that Mr. Flaherty, in the presence of the

---

[6] (Emphasis added.) *See also* U.S. Securities and Exchange Commission, *The Shareholder Proposal Rule: A Cornerstone of Corporate Democracy*, (Mar. 8, 2022), available at https://sec.gov/newsroom/speeches-statement/jones-cii-2022-03-08 ("[S]hareholders enjoy certain governance rights under state law, including the right to elect directors, approve major corporate transactions *and express their views on corporate governance matters and other fundamental issues related to the corporation's business*." (Emphasis added.))

[7] Perhaps anticipating this point, Defendants-Appellants went out of their way in the District Court to pejoratively paint Mr. Flaherty and his remarks as the rantings of a right-wing "conspiracy theorist" bent on creating a public "disruption" through "misconduct" in an effort to demonstrate that Defendants'-Appellants' censorship and viewpoint discrimination (the manifestation of Mr. Buffett's and Ms. Woollom's unilateral dictate as to the meaning of staying "on topic") were justified. *See, e.g.,* App. 31, 33, 38, 49 R. Doc. 21 at 3, 5, 10, 21.

officer, once again stated his refusal to leave. Add. 45 App. 37, R. Doc. 21 at 9, n.9 (link to Policy). The basis of this requirement is obvious: the arresting officer must have probable cause to make the arrest.

The District Court simply glossed over this requirement and held instead that, because Mr. Flaherty was already a trespasser and had already violated Section 20-155, the arrest was justified and lawful. Add. 19 App. 110 R. Doc. 36 at 19. But what the District Court never considered, never analyzed, and never found, is that the police officer witnessed or knew that Mr. Flaherty was a trespasser or witnessed or knew that he had already violated 20-155. Because the arrest was unlawful given the complete absence of any allegation in the Amended Complaint or extrinsic evidence demonstrating that the arresting officer knew of Mr. Flaherty's trespass or refusal to leave,[8] Defendants are liable in tort for causing the false arrest in the first instance.

---

[8] The Brief in Support of Defendants' Motion to Dismiss, App. 24-52 R. Doc. 21 at 1-24, is rife with purported statements of "fact" averred to establish this critical element of a lawful arrest based on the officer's independent judgment under Omaha Ordinance § 20-155. But not a single one of them is to be found anywhere among the allegations in the Amended Complaint or in any extrinsic evidence offered by Defendants. These statements are as follows: "An Omaha police officer witnessed Mr. Flaherty's trespass and arrested him for trespass." App. 30 R. Doc 21 at 2. "After Mr. Flaherty refused to leave, he was asked to leave again in the presence of an Omaha police officer." App. 30 R. Doc 21 at 2. "After Mr. Flaherty refused to leave, one of the John Does waved over a uniformed police officer who was already 'nearby.'" App. 34 App. 30 R. Doc 21 at 2 (citing ¶ 30 of the Complaint. Paragraph 30 says nothing about "refusing to leave.") "Consistent with

**II.    IN THE ABSENCE OF ANY PRIVILEGE GROUNDED IN TRESPASS, THE AMENDED COMPLAINT STATES LEGALLY COGNIZABLE CLAIMS OF ASSAULT, BATTERY, FALSE IMPRISONMENT, AND MALICIOUS PROSECUTION AS TO MR. FLAHERTY.**

The District Court dispensed with all of Mr. Flaherty's intentional tort claims by hanging its hat on its finding of trespass and the "privilege to eject" flowing from it. Add. 12 App. 103 R. Doc. 36 at 12 ("[T]he Court finds that the Berkshire Defendants' privilege to eject Flaherty from the meeting is ultimately fatal to all of Flaherty's intentional tort claims.") We demonstrated in Part I. above why that premise is itself fatal to the District Court's dispensation of Mr. Flaherty's intentional tort claims and will thus limit our discussion here to any additional bases the District Court cited, or could have cited, with respect to those claims.

---

Omaha Police Department policies, the John Doe again asked Mr. Flaherty to leave in the presence of the police officer." For this "fact," Defendants cite to the Youtube video showing Mr. Flaherty being arrested. App. 34 R. Doc 21 at 6, n.5. Because Mr. Flaherty's microphone had already been turned off, the only sound in the video is background noise of another person speaking through a different microphone. The video therefore does *not* demonstrate that Mr. Flaherty was again asked to leave in the presence of the officer, and it was baseless if not misleading for Defendants to assert otherwise. Thus, equally baseless is Defendants' assertion that the facts pled show Mr. Flaherty was arrested based on the independent judgment of the arresting police officer. App. 41, 43 R. Doc. 21 at 13, 15. The facts pled say no such thing. Although it is not clear whether the District Court relied on all or any of these misstatements in holding that the arrest was justified, it remains unequivocally clear that there *exist no* allegations or extrinsic evidence supporting that holding.

As to Mr. Flaherty's causes of action for assault and battery, the District Court, while reciting the elements of such a claim under Nebraska law, conducted no analysis as to the sufficiency of the pleadings beyond restating its holding that such sufficiency had to be viewed through the prism of Defendants' right to eject Mr. Flaherty from the shareholders' meeting. Add. 14 App. 105 R. Doc. 36 at 14. Setting aside that error, even upon this Court's *de novo* review of the pleadings in the Amended Complaint, as well as the video of which the Defendants asked the Court to take notice, Mr. Flaherty stated plausible claims of assault and battery.

The elements of an assault claim under Nebraska law are 1) "'an attempt [of] force" or "threats," 2) "made in a menacing manner," 3) "with intent to inflict bodily injury upon another," and 4) "with present apparent ability to give effect to the attempt, without requiring that the one assaulted be subjected to any actual physical injury or contact." *Bergman by Harre v. Anderson*, 411 NW.2d 333, 336 (Neb. 1987). To state a claim for battery under Nebraska law, a plaintiff must plead facts plausibly alleging "'an actual infliction' on an unconsented injury upon or unconsented contact with another." *Id.* at 336 (quoting *Newman v. Christensen*, 31 N.W.2d 417 (Neb. 1948)).

The allegations in the Amended Complaint, supplemented by the actual video, App. 34 R. Doc 21 at 6, n.5., of two imposing, plainclothes, private security guards confronting and accosting Mr. Flaherty as he stood at the microphone,

summoning a uniformed police officer, followed by one security guard then grabbing Mr. Flaherty by his right arm while the police officer grabbed him by his left, holding onto Mr. Flaherty's right arm while assisting the police officer in marching Mr. Flaherty out of the meeting, sufficiently satisfy all of the elements of both civil assault and battery. Moreover, this Court may draw a reasonable inference of the private security guards' intent to assault and batter Mr. Flaherty given the fact that they summoned a police officer for the clear purpose of arresting Mr. Flaherty and physically ejecting him from the meeting at the behest of Mr. Buffett.

Turning to Mr. Flaherty's false imprisonment claim, it bears reiterating that what the District Court never considered, never analyzed, and never found, is that the arresting police officer witnessed or knew that Mr. Flaherty was a trespasser or witnessed or knew that he had already violated Section 20-155. Thus, the District Court's recognition that there exist circumstances under which a private citizen can be held liable for causing an arresting officer's false imprisonment of another private citizen; Add. 18 App. 109 R. Doc. 36 at 18 (quoting *Huskinson v. Vanderheiden*, 251 N.W.2d 144, 146 (Neb. 1977)) is squarely apposite here. Because the arrest was unlawful given the complete absence of any allegation in the Amended Complaint or extrinsic evidence demonstrating that the arresting

officer knew of Mr. Flaherty's refusal to leave, Defendants are liable in tort for causing the false arrest in the first instance.

For precisely the same reasons, Mr. Flaherty stated a cause of action for malicious prosecution. The District Court once again recognized that Defendants may have been liable in such a tort because a third party who "directs or counsels officials in such a way so as to actively persuade and induce the officer's decision . . . may still be held liable for malicious prosecution." Add. 20 App. 111 R. Doc. 36 at 20 (quoting *Holmes v. Crossroads Joint Venture*, 629 N.W.2d 511, 526-27 (Neb. 2001)). As it reasoned, however, with respect to Mr. Flaherty's false imprisonment cause of action, the District Court once again held that where, as here, "the exercise of the officer's discretion ma[de] the initiation of the prosecution its own," Defendants were shielded from liability. *Id*. (quoting *McKinney v. Okoye*, 842 N.W.2d 581, 592 (Neb. 2014)). But as previously demonstrated, there is absolutely nothing in the Amended Complaint or in any extrinsic evidence offered by Defendants evidencing that the uniformed police officer did anything other than arrest Mr. Flaherty because Defendants'-Appellees' private security guards told him to.[9]

---

[9] Drawing any such inference to the contrary based solely on the only extrinsic evidence of the arrest – the Youtube video -- would run afoul of the black-letter principle that, on a motion to dismiss, all inferences must be drawn in the favor of

In addition, given the lack of any justification for Defendants'-Appellees' directive that Mr. Flaherty be arrested, falsely imprisoned, and prosecuted, and further given the gross abrogation of NLPC's and Mr. Flaherty's rights as a Berkshire Hathaway shareholder with a proxy proposal, there can be no doubt that Defendants'-Appellees' directives were the malicious manifestations of private censorship and viewpoint discrimination.

**III.  THE VIDEO THAT DEFENDANTS CALLED TO THE DISTRICT COURT'S ATTENTION IN THEIR MOTION TO DISMISS ESTABLISHES MR. TOVAR'S CLAIMS FOR ASSAULT, BATTERY, AND FALSE IMPRISONMENT.**

As noted in Part I. above, Defendants asked the Court to incorporate into the Amended Complaint by reference the video of Mr. Flaherty's arrest, citing that video for the proposition that, "Consistent with Omaha Police Department policies, the John Doe again asked Mr. Flaherty to leave in the presence of the police officer." App. 34 R. Doc 21 at 6, n.5. And as further stated in Part I. above, the video shows no such thing because there is no sound other than someone else speaking over a loudspeaker in the background. What the video *does* show, however, is conduct by a Berkshire Hathaway agent satisfying each and every one of the elements of Mr. Tovar's assault, battery, and false imprisonment claims. App. 34 R. Doc. 21 at 6, n.5.

the non-moving party. Moreover, that the charges were quickly dismissed further underscores the lack of probable cause for the arrest.

While finding the allegations in the Amended Complaint as to those claims wanting, Add. 21-22 App. 112-113 R. Doc. 36 at 21-22, the District Court makes no mention of the video. Irrespective, however, of whether the District Court considered the video in its disposition of Mr. Tovar's claims, this Court may and should do so. *See, supra,* n.4.

Each element of Mr. Tovar's assault, battery, and false imprisonment claims is satisfied by what the video clearly shows. When Mr. Tovar tries to leave the meeting following Mr. Flaherty's seizure, one of the two plainclothes security guards runs up behind him, seizes him by his left arm, thereby unlawfully touching him,[10] steps in front of him, and raises both his hands to indicate that he is not permitting Mr. Tovar to leave the meeting, placing Mr. Tovar in apprehension of further and immediate physical contact[11] and restricting him from leaving the Center with Mr. Flaherty against his will and without his consent.[12]

---

[10] A civil battery is "'an actual infliction; of . . . unconsented contact with another." *Bergman by Harre v. Aderson*, 226 Neb. 333, 411 N.W.2d 333, 336 (1987).

[11] Civil assault is "a wrongful offer or attempt with force or threats, made in a menacing manner, with intent to inflict bodily injury upon another with the present apparent ability to give effect to the attempt." *Crouter v. Rogers*, 193 Neb. 497, 227 N.W.2d 845, 847 (1975).

[12] "Any intentional conduct that results in the placing of a person in a position where she or she cannot exercise his or her will in going where he or she may lawfully go may constitute false imprisonment." *Holmes v. Crossroads Joint Venture*, 26 Neb. 739, 251 N.W.2d 144, 146 (1977).

## IV. THE AMENDED COMPLAINT STATED A LEGALLY COGNIZABLE CAUSE OF ACTION FOR PROMISSORY ESTOPPEL.

To successfully plead a claim of promissory estoppel, a plaintiff must allege 1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, 2) the promise did in fact induce the plaintiff's action or forbearance, and 3) injustice can only be avoided by enforcing the promise. *Morris v. Dall,* 320 Neb. 122, 26 N.W.3d 304, 315 (2025). As the Supreme Court of Nebraska observed in *Blinn v. Beatrice Community Hosp. and Health Center, Inc.* 270 Neb. 809, 708 N.W.2d 235 (2006),

> Under Nebraska law, the doctrine of promissory estoppel does not require that the promise giving rise to the cause of action must meet the requirements of an offer that would ripen into a contract if accepted by the promisee. Simply stated, there is no requirement of "definiteness" in an action based upon promissory estoppel. Instead of requiring reasonable definiteness, promissory estoppel requires only that reliance be reasonable and foreseeable.

*Id.* at 246-47 (2006) (citations and internal quotations omitted).

The District Court held that the only promise Plaintiffs-Appellants identified in their Amended Complaint was that they would be allowed to present their proposal at the shareholders meeting. Add. 23 App. 114 R. Doc. 36 at 23. The Court further reasoned that because SEC regulations require a shareholder to attend the meeting, such an obligation is not a promise and the absence of any promise was fatal to the promissory estoppel claim. Add. 23 App. 114 R. Doc. 36 at 23.

Here the District Court fundamentally misconstrued the nature of the promises on which Plaintiffs-Appellants relied. The promise at issue was not simply that Plaintiff-Appellants would be permitted to present their proposal, but that they would be permitted to present *the full content of their proposal*, given previous publication of both the Notice and the entirety of Mr. Flaherty's planned remarks on NLPC's website and Berkshire Hathaway's published "Microphone Manners" stating that any topic other than politics or Berkshire's investments was "fair game."

Simply stated, the promise upon which Plaintiffs-Appellants reasonably relied to their detriment (incurring the costs of traveling from Virginia to Omaha) was that the topics contained in their previously published remarks would be "fair game" and that they would be permitted to make their presentation without being censored, interrupted, and thrown out of the meeting. Indeed, such reliance was only reinforced by Mr. Buffett's promise to Mr. Flaherty that he would be permitted to make the remainder of his presentation so long as he stayed within the three-minute limit. App. 129 R. Doc. 56 at 13; App. 87 R. Doc. 22-3 at 278. Mr. Flaherty, relying on that promise, agreed to continue with his remarks under the conditions imposed by Mr. Buffett, only to have Mr. Buffett breach his promise and cause Mr. Flaherty to suffer the public ignominy of his arrest in front of thousands of attendees, and later as reported in the press.



## V. THE DISTRICT COURT ERRED IN ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE.

Four days after Plaintiffs-Appellants filed their Amended Complaint, the Magistrate Judge assigned to the case, apparently *sua sponte*,[13] issued a Findings and Recommendation, Add. 26-27, R. Doc. 57 at 1-2, that substantively stated, in its entirety, that "the claims against Defendants Berkshire Hathaway, Inc. and Warren Buffett be dismissed in their entirety for the reasons stated in the Court's October 29, 2024." Add. 26, R. Doc. 57 at 1. Why the Magistrate Judge found it

---

[13] There is no indication from the District Court docket sheet, App. 1-9, that the District Court referred the Amended Complaint to the Magistrate Judge in the first instance.

necessary to make such findings and recommendation as to those two Defendants is unclear given that the sole purpose of the Amended Complaint was to substitute the two John Doe Defendants with Defendants Dan Clark and Chris Thompson. Equally unclear is why the District Court went out of its way to note, in its Order Accepting Findings and Recommendation of United States Magistrate Judge; Add. 28 R. Doc. 63 at 1, that Plaintiffs-Appellants had lodged no objection to a Findings and Recommendation that provided no actual findings beyond those contained in the District Court's Memorandum Opinion granting Defendants'-Appellees' Motion to Dismiss. Add. 1-25 App. 92-116 R. Doc 36 at 1-25.

The sum effect of this pointless exercise was artificially to create the impression that Plaintiffs-Appellants had been given the opportunity to object to a court order that had already issued four months previously as a means of immunizing that decision from appellate review. On that basis alone, this Court should find that the District Court erred in adopting the Findings and Recommendation of the Magistrate Judge.

# CONCLUSION

For all of the forgoing reasons, the judgment of the District Court should be reversed.

Dated:  November 19, 2025          Respectfully submitted,


/s/ Jeffrey E. McFadden
LAW OFFICES OF
JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
Phone: (443) 272-4737
jmcfadden@jmcfaddenlaw.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,338 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because, this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

/s/ Jeffrey E. McFadden

Attorney for:   Appellants

Date:   November 19, 2025